Good morning ladies and gentlemen. Mr. Fitzpatrick, do you have some motions to make? I do, your honors. I'm pleased to move the admission of Elise Fisher, who is a law clerk to Judge Bauer. She received her undergraduate degree from the University of Tennessee, and her law degree is from Loyola. And she's admitted to practice in the state of Illinois. And the admission of Judge Caney's law, your law clerk, Alejandro Rettig-Martinez, who went to Haverford College, undergraduate, University of Chicago for law school, and is admitted to practice in the state of Pennsylvania. And I move their admission. I hear objection from either of my colleagues. We'll grant the admission and be sworn in.  First case this morning is... U.S. v. Davis May it please the court. My name is Scott Sakiyama, and my client, Keenan Davis, was convicted of two counts of being a felon in possession of a firearm. At trial, his defense was that he was set up and convicted by the false testimony of Ms. J. Gaff and Mr. Anthony Wamui. This couple framed Mr. Davis because if they didn't, they would have found themselves on trial. They were both convicted felons and could not possess a gun without committing a crime. In fact, Mr. Wamui had only been released from prison less than a month before the July 20, 2016 incident. Relying on their testimony to convict Mr. Davis made for a weak case. But three evidentiary errors occurred that allowed the conviction of my client by bolstering this weak case. First, Officer Klein was permitted to recount what the couple told him happened that day. Allowing this testimony to be presented through Officer Klein took extremely unreliable testimony and presented it to the jury through a seemingly objective and reliable third party. This bolstering prevented Mr. Davis from making a successful showing that Ms. J. Gaff and Mr. Wamui were fabricating their testimony. To show that they were fabricating their testimony, Mr. Davis of course needed evidence of their felony convictions. And that evidence came in. In furtherance of this defense, Mr. Davis showed that their testimony had other issues such as inconsistency or the inability to remember details of their made up story. Questions like this are going to be commonplace when a party needs to show that a witness is fabricating testimony. Prior consistent statements to rebut a charge of fabrication or improper motive are only allowed under Rule 801 D1B1 where the prior statements were made before the motivation to fabricate or the improper motive arose. Statements made after the motivation arose are not relevant to rebutting the charge of fabrication. They are merely cumulative of the trial testimony and they are thus not allowed as impermissible bolstering. This rule is designed to prevent precisely the testimony at issue here. Is that requirement that the statement had been made before a motive to why had arisen, how clear is that under the current version of 801 D1B? D1B. 1 and 2. 1 and 2. 1 and 2. Certainly. So it's clear that with respect to Subsection 1 that there's no question that the requirement, that requirement was preserved when the rules were amended. Under Subsection 2 that requirement should apply here. Okay, I understand your argument that it should apply. And it's an interesting argument. It's not explicitly in the rule. We can have an interesting debate about it. But here we're also under a plain error standard, right? That's correct. That's a big problem when the evidentiary issue is debatable. So give me your best shot as to why we should treat this debatable issue as plain error. Certainly. So this error was plain because here you have a particularly egregious case where the crucial issue, the crucial fact for the jury to decide, was whether or not these two witnesses are lying. No other witnesses could create belief for the jury beyond a reasonable doubt that Mr. Davis brought the gun and possessed the gun that day. Under these circumstances, and where the witnesses have such a clear motivation to lie, the requirement for that statement to be made prior to the motivation should have been recognized. But it hasn't even been recognized explicitly broadly in the courts. It's still debatable. And that's a very tough burden to put on a district judge to say, you've got to raise this objection, stop with your own interrupting objection, when defense counsel hasn't done it. It's true that defense counsel did not raise this issue. But here the key issue that the parties knew and that the district court was aware and that was key for the jury to decide was whether or not these witnesses were telling the truth. This is particularly, and I think this is a situation where weighing the circumstances, weighing the facts and the background of the two witnesses, and that they had just as much of a motivation, in fact they had to create a story where they did not possess the gun, that there needed to be an analysis done of whether or not this testimony was barred by the premotivation rule. Here these witnesses, they were no strangers to law enforcement or the justice system or criminal liability. And on July 20th they knew that the police were going to be arriving. And in fact here the testimony showed that Missy called them, right? She's the one who called 911. Jackie didn't actually call 911. She was on the 911 call. At some point I believe she heard. I believe she got on the call that her son initiated. But I believe the testimony was that she did not have a working phone in her house. So after and prior to being on the 911 call, Miss J. Gaff testified that she took the time to pick up the gun after Mr. Wamui had pinned Mr. Davis to the ground with two fingers and carry it very carefully to a place where the police would find it. And the reason that she did that was because at that time she was already thinking about what would happen if her fingerprints were on that gun. She was clearly thinking about what would happen if there was evidence that she had in fact possessed that gun. This occurred before her statements to Officer Klein. So it was critical to Mr. Davis to show that these two people who were the only ones who could definitively state that he brought the gun and that he was the initial aggressor were fabricating their testimony. His attack was not based on another ground. His position and his defense was not that they misremembered who brought the gun or that they just couldn't remember where the gun came from. He attacked them because it was their gun and that they had to make up a story to cover up that fact. An attack on a witness because they're fabricating testimony is regularly going to be accomplished through testimony that the witness has slipped up in a story by failing to remain consistent or forgetting key details because they're making the story up. Allowing the government to point to isolated questions and then claim that those isolated questions are an attack on another ground would eviscerate the pre-motive requirement. Next slide. After introducing Officer Klein's testimony, the government then called C.D., Mr. Davis' young daughter, 6 years old. Her testimony provided no pre-motive value because she never saw who brought the gun. She testified that her mother told her there was a gun. And while the government claims that she offered conflicting testimony so that the jury should decide what is true or what is not, that's not the case. One of the statements the government points to is question, so you saw that but you didn't see Daddy Anthony and Daddy Kenan fighting? Answer, no, but what I saw is Daddy Anthony trying to get that gun from Kenan. Immediately after that statement, defense counsel elicits the testimony, the definitive statement that question, did you tell your mommy, or excuse me, question, did your mommy tell you you have to remember the gun? Answer, no. Question, okay, you just knew you remembered the gun? Answer, no, I haven't seen that gun, but I know that he had it because, well, my mom told me he had a gun. That was immediately following one of the statements the government pointed to. Additionally, another statement the government points to is materially inconsistent with Mr. Wamui's statement. The government notes that both C.D. and Mr. Wamui testified that after that, Mr. Wamui first exited the house and Mr. Davis followed him. However, Mr. Wamui testified that at that point he had the gun. He had gotten the gun from Mr. Davis inside the house and then ran out of the house with the gun. C.D. testified that at that point Mr. Davis had the gun, and so you essentially had an armed man chasing an unarmed man. That is materially inconsistent with what Mr. Wamui was testifying to at the time. So what? Why does that make a difference? Because that is indicative that she didn't see the gun, that what she knew was. . . So you've got a six-year-old child whose evidence is wobbly, doesn't help the government that much, and we have no objection, right? That's correct. This was another error that was not raised below. That's correct. And so the issue. . . You've got an argument that maybe some of this is without personal knowledge, but maybe some of it is. She's just not that clear. It's hard for me to see a plain error there, Counsel. Well, as Your Honor stated, there is very little that you have some testimony that doesn't really help the government that much. But you also had a six-year-old girl testifying against her own father about truly horrific events. There's a physical altercation between her and her mother. Sure. I understand that, but where does this turn into a reversible error? This turns into a reversible error where you have the. . . You had, after the impermissible bolstering, you now have a witness who, as a six-year-old girl testifying against her own father, and the jury is pointed to her emotions through an initial question of, do you recall the day that your father came over and it made you sad? All this shows that the testimony does not go to try to inflame the jury and have the jury decide on an. . . Or it's just that the government witness turns out to be not as helpful as you sometimes hope as a prosecutor. I mean, everybody's familiar with that phenomenon. I think this was a case because of the youth of the child, the horrendous nature of the events that she was going to be talking about, the fact that the jury was aware she did not feel comfortable testifying without a companion. All of this makes for a witness where sympathy for the witness and prejudice towards Mr. Davis are the key factors that the jury would take away from this testimony. Next, the government called Agent Lesner to attempt to prove count two. This is a rare case because the government called Agent Lesner solely to impeach him, and we don't have to guess about that. They called J.R. solely to impeach him. I'm sorry. Yeah, that's correct. They called J.R. solely to impeach him through Agent Lesner. We know that because that is exactly what the government said, that they had one thing to get out of him. Well, they sort of qualified it. They said, we think he might, or was it definite? They said, I have one thing to get out of him. I anticipate that he's going to say another one thing, and it will trigger another witness. They also asked to treat him hostilely. You used the term anticipate? Yes, the word was anticipate, and they said that they were going to treat him as a hostile witness. I would like to reserve the remaining time for rebuttal. Yes. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. I'll start with the evidentiary issues. As has been pointed out, we are on plain error review on all three of the evidentiary issues, and this Court has stated that that standard means that the errors to prevail when reversal, the defendant must show the errors were so obvious and prejudicial that the district court should have intervened without prompting, and all of these evidentiary errors fail on that standard and are at least one of the traditional prongs of plain error review. I think, as the Court had pointed out, had this issue been raised in the district court, there could have been an interesting merits debate about exactly what amended Rule 801 D-1B means, but that argument is not one that should be raised in the appellate court. At the appellate court level, the question is whether the error is plain, and when you have a rule that was amended four years ago that appears to have at best been interpreted by two district court cases, one of which really just sets forth the rule, and the other of which says, I actually don't have to get into the issue because there's no argument that it falls under D-1B-2, what you actually have is a rule that's never been interpreted before, and I think it would be a rare rule that's never been interpreted before where you could establish plain error. Under this Court's 1984 decision in Harris, statements could be admitted even if they occurred prior to the motive to fabricate for rehabilitation purposes. There are discussions in the discussion of the 2013 notes to what became the 2014 amendment saying the purpose is to take those rules that were previously admitted solely for rehabilitation and drop them into the substantive basket on the ground that juries really can't discern the difference between substantive and rehabilitation anyway, and so rather than exclude them, we should just let them in and let jurors do what we think they might be doing anyway. Now, maybe that's wrong. Maybe that's not what the intent of the rule was, but we're on plain error, and so we can't get to that at this point. And I would also say that the defendant's going to fail here on the whether this affected his substantial rights even if he could show plain error, and the easiest way to see that is in the cases he himself cites in the reply brief, the Simonelli case from the First Circuit or the Ramos-Caraballo case from the Eighth Circuit, where those courts basically say, look, if this information came in and it's not like the Tomei case where you get just a little bit of nothing from the witness, and you admit all these consistent statements that are really their caretaker or their therapist or putting in all of the testimony, if instead they're just reiterating the testimony, it is merely cumulative, and we don't think, absent extraordinary circumstances, that that is going to sway the jury. On count one, Your Honors, the jury I do not believe convicted in any way, shape, or form because Officer Klein regurgitated Jackie Gaff's testimony. The jury had to listen to Jackie Gaff and Anthony Rimui and also to the 911 calls and discern based from that whether or not this claim that somehow Jackie Gaff brought Keenan Davis over to her apartment filled with children in the middle of a neighborhood on a weekday to try to set him up with the guy made any sense, and it didn't make any sense. And I don't think any juror could have listened to the 911 call, which is Exhibit 1, Track 6, from Jackie Gaff and believed in any way, shape, or form that she was setting him up and that she wasn't instead completely terrified because a man that she knew had just come and put a gun to her temple. At any rate, I don't think the defendant can show that there is a plain error or that there was any effect on his substantial rights. As to C.D.'s testimony, again, the defendant had a hearing, said it's okay for her to testify, that the district court on its own should have come in and said, no, this witness can't testify under those circumstances. Again, this is nothing amounting to plain error. I believe C.D. did provide valuable testimony. The jury could decide for itself whether she saw the gun, whether she was confused by the question, whether she didn't see the gun. It's pretty marginal for a 6-year-old, though, just in general, to be testifying. I think it was, and I think this was a difficult situation. We actually attempted to try to get the statements in through other means. The district court concluded, perhaps correctly, that those would have been hearsay means, and we felt we needed to bring her in. I will say, initially, there were sort of a couple of competing claims. I think it's a little, I don't think it's quite correct that there was sort of one theory of defense. It was, well, maybe there was a gun there. Maybe Jackie Gaff introduced the gun. Maybe Anthony Wamui introduced the gun after there was some kind of fight. And C.D.'s testimony is clear on the point that Anthony Wamui did not introduce this gun into the equation because she came in with Wamui. They came in together upon the scene, and this fight was already going on. So that pretty much washes out of the water any argument that Wamui introduced the gun. And now the jury is really just left with the question of, did Davis bring the gun, you know, that Maurizio Cosi saw in his waistband and that was found, or did Jackie Gaff set him up and lure him over there and then produce the gun, and this fight happened. Then her daughter and her boyfriend stumbled upon. And so I think her testimony, at minimum, was helpful on that. And if the jury felt, hey, no, she's just confused on this question, and the other four are real, she really did see the gun, I think that provides compelling and valuable testimony. So at a minimum, the standard here, though, is, was it plain error for them to even allow her on the witness stand? And it doesn't rise to that level. So that does it for count one. On count two on the issue that was. . . Yes, I'm sorry, on count two. First of all, on the impeachment issue, I think this, again, we have to go to a plain error standard. I actually don't think that there's error here. But at a minimum, in light of Patterson, Webster, Burt, and Davis, there are four cases, all of which say if the government doesn't know what the witness is going to say, the government can call the witness to the witness stand and see what the witness is going to say, and then if the witness recants, the witness can be impeached. And that is clearly this fact pattern. If you look at pages 193 through 195 of the Joint Appendix, the assistant U.S. attorney very forthrightly says, Kenan Davis, Jr. has not responded to me when I've reached out to talk to him. The court asks again, have you met this witness? AUSA, no, he won't respond to me, he won't respond.  The court turns to defense counsel. You know, this would be a perfect time, since we're on plain error view, for the defendant to raise some kind of objection. In some of the cases, there are attorneys who have stood up and said, I want to voir dire the witness, I want to know what the witness is going to say, blah, blah, blah. Defense counsel doesn't do that. Instead, the court says, well, how long do you expect the witness to take? And the assistant says, well, you know, this is really an anticipation of a break. I only really have one thing to get out of him. I anticipate he's going to deny making the statement, which will trigger another witness. All of this is completely fine under the law. The government can have every expectation that the reason the witness is ducking is because the witness is thinking about lying. We'd also listen to all of the jail phone calls from Mr. Davis where he's talking to the witness. It was no indication that he was going to testify otherwise. We had no knowledge of what he was going to testify to. The only information we had. If counsel was correct, the response was, we anticipate he's going to testify in a particular way. I mean, all we could have said, well, I guess I think the hope under the law is that when a witness takes the oath to tell the truth that they will. I think realistically and practically our belief was that the reason he was ducking is because he was under some pressure from his father to recant his testimony. And that there was a reasonable likelihood that he wasn't going to testify truthfully. And that's a realistic expectation that we're allowed to take. But under the law, we're allowed to put that witness on the witness stand and see. And if under the oath, he then testifies truthfully. Yep, that's my dad's gun. We have no reason to call the agent at that point. We have our information. You have a sort of a black and white thing. Unless he told you otherwise, you can be able to call him. I think that's true. So I think actually under on this issue, I think we actually prevail simply on the merits. There was no error. But at a bare minimum, there's no plain error. And I also don't think it affects his substantial rights under the circumstances or caused any prejudice. Was J.R. helpful in any other respect to the government? I think that J.R. was helpful to the government on the first count. There is discussion about that count as well. And we did have him briefly testify that he was not present at the scene and that he really didn't. He woke up that morning and went to work. And I think that's helpful because if you read the jail phone calls, there's a great deal of discussion about Davis trying to get somebody, sounds like J.R. and then sounds like maybe Jim Bob Sullivan, to say, well, I was there. I came upon the scene at the Millbrook apartments and I saw these things. So that kind of closes off that avenue as well. I think as it turns out, he did also provide helpful testimony to us. In fact, in declaring, you know, that he, you look at the, turning to the sufficiency issue essentially, you look at all of these different stories from the witnesses, right? So Heather says, a couple of weeks ago we found this gun in the cushion and it was sitting there and we told Reggie to get it, but on the phone call she makes some suggestion that it's Jamon's gun. And then J.R. says, I've never seen this gun before, but I told the agent something different. I told the agent that it was my gun, even though I've never seen this gun before. And then you have Jim Bob Sullivan, who testifies, I live in that apartment. I've never seen any weapons. I've never seen any ammunition in the house. There's ammunition in the house. There's two weapons in the house. J.R. says there are weapons in the house. So combining all that, I think there is helpful substance of testimony that comes out from J.R. And I think when you look at the sufficiency, combining all of that with the fact that Mr. Davis is the head of this household, the gun, according to Heather, has been there for a couple of weeks, and then you have these Crown Royal bags, none of which actually have Crown Royal in them, one of which is tied literally to the inside of the guy's underwear. You can't get much more closely connected to somebody than that. Then the second bag is in the crawl space in the basement with the open vent, and there's two things in there, Crown Royal bag number two and a gun lock. And then Crown Royal bag number three is out in the open in the guy's laundry room or mud room. I don't know if it's really a laundry room when the dryer is broken, but the back room with the third Crown Royal bag, and what's in there? The gun. So that, I think, the court can tie all of that together and can review all of that. Was the gun assembled or disassembled? It was in pieces. It would be disassembled. I guess we'll call it disassembled, Sheriff. Let's call it disassembled. The reality is that the courts have been, first of all, the defense is not raising any objection related to that, so it would be waived, but the courts have been clear that if, the definition of a firearm is something that was designed to fire, unless it's now to the point that it's so destroyed that it can't be reassembled. So it does meet the statutory definition of a firearm. I agree it's not the, certainly count two is not as egregious as count one, although the district court gave a sentence four times as long on count one as count two and imposed a concurrent sentence, so I think the district court recognized that point. The reality, though, is that this is a violation of statute and it's a violation of the court, that the jury could look at all of the facts, all of the evidence, and reach that common sense conclusion. And since there were no evidentiary errors on that count or on count one, we believe that everything here, certainly on a plain error standard and a sufficiency of the evidence,  Mr. Holler, to compare and contrast this evidence to the Griffin case, where we've got at least some similarities with the constructive possession theory in a lot of people in the house. Well, again, there are similarities, but I think there are differences as well. And I think, so there are several differences. The first difference that I think is critical is, in Griffin, we knew the provenance of the gun. So this is the father's gun. Everybody, all the defense witnesses agree it's the father's gun in Griffin. The government doesn't dispute that it's the father's gun. They're basically just trying to say, well, the defendant had access to the gun, and so therefore he has some ability to control the gun. That's not the argument that's being made here at all. Here, we have at least three and probably four different stories about the gun, right? So on the jail call, it's Jaman's gun. According to Heather, it's Reggie's gun. According to J.R., he's never seen the gun before, but there are other guns in the house. And according to Jim Bob Sullivan, he's never seen the gun before, and there have never been any guns in the house. So I think the jury can take all of that together and say, look, who's responsible for this gun, right? I mean, if it's Reggie's gun, why doesn't everybody just say it's Reggie's gun? Why are they all coming up with this? And you can combine that with the fact of who's in control of the house. Now, I have no idea who was in control of the Griffin household. My guess would be the father's in control of the son, but those are enough family dynamics. I'm not going to necessarily speculate. Here, though, there's no dispute who's in charge of this house, okay? I don't think anyone reading this transcript or any juror sitting through the trial could have had any doubt who was in charge of that household. It was the breadwinner, and it was, frankly, the abuser who dominated Jackie Gaff when she lived in the house, Heather Gaff and her mother, who still lived in the house, and probably J.R. as well. If you read through the jail transcript phone calls, he's trying to manipulate J.R., Jim Bob Sullivan, Heather Gaff, all these people who are in his control. He's controlling the people in the house. So can't the jury infer from that that he's also controlling the gun in the house? This gun is also, I would note, out in the open. The firearm in Griffin, oddly enough, I believe was in a closet. There were other firearms that the jury acquitted on that were behind a refrigerator or in other closets. There wasn't anything distinctive about the gun that was found. It was a very odd situation in Griffin. Here there's one gun. Well, there's other things that are found in the room that J.R. claims in his bedroom that we didn't charge him with. But this gun is out in the open. It's obvious. Heather says it's been there for a couple weeks. This is not a case purely about access. It's about access and intent. The defendant clearly has the intent to control everything and everyone in that house. And then you also have a specific connection, which is the Crown Royal bags. And I think that also is a specific tie and a specific connection that we wouldn't otherwise normally have. The court in Griffin at 684 F. 3rd 698 said, Did the government establish a likelihood in some discernible fashion that the excused had a substantial voice via the items in question? And we did that. We established that here, that the jury could make that inference. Probably didn't have to make that inference. It's an overwhelming evidence case, but it's enough to meet the sufficiency standard. I see I'm out of time. We would ask the court to affirm. Thank you. Thank you, counsel. May it please the court. The substantial connection does not exist. The head of household argument that the government cites here, they cite the United States v. Jones. That term appears nowhere in that case. In that case, there was a defendant who was found in a house with one other person. He'd been observed dealing drugs in that house. There was a substantial amount of drugs found in the open, and there was a gun next to the drugs. The court said because he was in the drug trade and because there were drugs in the house and because in trade amounts and because there's a substantial connection between guns and drugs, that was a substantial connection for the defendant in that contraband. Here, this case presents nothing like that. What the government is saying here is that because Mr. Davis, for some reason, had a crown royal bag tied to the inside of his shorts, that something else in the house that was in a crown royal bag must, beyond a reasonable doubt, be his. A disassembled gun that was in so many different pieces that the ATF agent had a hard time putting it back together. Essentially, the head of household argument is trying to fold in. The government is trying to take the position that Mr. Davis, in fact, owned the house, and that's simply not the evidence in the record. Additionally, related to count two, the best evidence, essentially, that the government had that Mr. Davis that the gun belonged to Mr. Davis was the testimony of Agent Lesner about what J.R. said to him that day. A hearsay statement admissible only for impeachment purposes and not as substantive evidence. The government cannot cite to a case and did not cite to a case where the impeachment was so critical and so to the issue that they were trying to prove. Additionally, the government, on the day of the trial, stated that this was the one thing that they wanted to call the witness for. They didn't mention any other helpful testimony. And in any of the cases that the government cites where there was additional helpful testimony, that helpful testimony was extensive. I believe the Burke case references nine different topics. And I see I'm out of time. Thank you. Thank you, Counsel. Thanks to, were you court appointed in this case? Yes, Your Honor. Thank you very much for representing your client well in this case. And thanks to both counsel in the case to be taken under advisement. Thank you.